UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

FRANK K. IANNUCCI,                    :
        Plaintiff,                    :
                                      :
    v.                                :        CA 04-371 M
                                      :
JO ANNE B. BARNHART,                  :
COMMISSIONER,                         :
SOCIAL SECURITY ADMINISTRATION,       :
        Defendant.                    :

### MEMORANDUM AND ORDER

This matter is before the court on a request for judicial review of the decision of the Commissioner of Social Security ("the Commissioner"), denying Supplemental Security Income ("SSI") benefits, under §§ 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3) ("the Act").  Plaintiff Frank K. Iannucci ("Plaintiff") has filed a motion to reverse or remand.  Defendant Jo Anne B. Barnhart ("Defendant") has filed a motion for an order affirming the decision of the Commissioner.

With the parties' consent, this case has been referred to a magistrate judge for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 73.  For the reasons set forth herein, I find that the Commissioner's decision that Plaintiff is not disabled is not supported by substantial evidence in the record.  Accordingly, based on the following analysis, I order that Plaintiff's Motion to Reverse and/or to Remand (Document ("Doc.") #9) ("Motion to Reverse or Remand") be granted and the matter be remanded for further administrative proceedings consistent with this opinion. I further order that Defendant's Motion for Order Affirming the Decision of the Commissioner (Doc. #15) ("Motion to Affirm") be denied.

**Procedural History**

Plaintiff filed the instant application for SSI on September 13, 2000, (R. at 128), alleging disability since September 1, 2000, due to depression, migraine headaches, severe anxiety, a back injury, a neck injury, leg numbness with burning and tingling, and drug side effects, (R. at 128-29, 137). The application was denied initially, (R. at 85), and on reconsideration, (R. at 94). Plaintiff timely requested a hearing before an administrative law judge ("ALJ"), (R. at 98), which was held on July 23, 2002, (R. at 36-82).

On September 13, 2002, the ALJ issued a decision in which she found that Plaintiff was not disabled and, therefore, not entitled to SSI. (R. at 15-24) Plaintiff appealed the ALJ's decision to the Appeals Council, (R. at 10-11), which on June 22, 2004, declined Plaintiff's request for review, (R. at 5), thereby rendering the ALJ's decision the final decision of the Commissioner, (id.).

Plaintiff filed a complaint (Doc. #1) in this court on August 25, 2002. Defendant on October 27, 2004, filed her answer (Doc. #2), and the case was subsequently referred to this Magistrate Judge for all further proceedings, see Order of Reference (Doc. #3). On March 14, 2005, Plaintiff filed the instant Motion to Reverse or Remand (Doc. #9). The Motion to Affirm (Doc. #15) was filed on May 23, 2005. Plaintiff submitted a reply brief on June 3, 2005. See Plaintiff's Reply Brief (Doc. #16).

**Issue**

The issue for determination is whether the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence and is legally correct.

2

## Background

Plaintiff was born on April 18, 1960.  (R. at 83-84, 128, 129-30, 146)  He has a high school equivalency education and no past relevant work.  (R. at 16, 138)

## Medical Evidence

The record contains the following exhibits: an intake form from Affiliates for Psychotherapy and Counseling (November 29, 1999), (R. at 162-65); progress notes from Blackstone Valley Community Health Care, Inc., where Plaintiff was treated by Dr. Lynn Ho, M.D. (May 21, 1999-April 29,2002), (R. at 167-78, 185-87, 255-67, 272-73, 385-86); a transcription of notes from a consultative examination by Oswald Cinquegrana, M.D. (October 16, 2000), (R. at 198-99); a transcription of notes from a consultative examination from Frederick Evans, M.D. (November 14, 2000), (R. at 200-02); reports, discharge instructions and summaries, individual psychotherapy notes, Beck Anxiety Inventories, and questionnaires from Rhode Island Hospital's Adult Partial Hospitalization Program (April 5, 2002-May 7, 2002), (R. at 289-380); two medical questionnaires, treatment notes, physician orders, a memorandum to Dr. Ho, and a letter to Attorney David Green from Peter Polister, M.D.[1] (November 8, 2000-May 8, 2002), (R. at 235-36, 274-83, 287-88, 382-84); and two letters to Plaintiff's attorneys and a supplemental questionnaire as to Residual Functional Capacity ("RFC") from David Swain, M.S.W. (April 2, 2002-July 16, 2002), (R. at 284-86, 387).

In addition, the record includes: a Physical RFC Assessment and a Rhode Island Disability Determination Services ("DDS") Case

---

[1] Although the List of Exhibits indicates that pages 274 through 286 of the administrative record contain "[m]edical [r]ecords for the period 11/8/00 through 4/19/02 from David Swain, MSW," (R. at 3), only pages 284 through 286 can be attributed to Mr. Swain.  Pages 274 through 283 contain records from Dr. Polister.  (R. at 3, 274-86)

Review Form from Youssef Georgy, M.D. (October 18, 2000), (R. at 188-96); a Physical RFC Assessment and a DDS Case Review Form completed by Edward H. Hanna, M.D. (April 17, 2001), (R. at 226-33); a Psychiatric Review Technique Form ("PRTF"), Mental RFC Assessment, and DDS Case Review Form from Dorothy C. Fishman, Ph.D. (November 11, 2000), (R. at 203-21); and a PRTF, Mental RFC Form, and DDS Case Review Form by Maryann Gnys, Ph.D. (July 25, 2001), (R. at 237-54).

## Administrative Hearing

Plaintiff, represented by counsel, appeared at the July 23, 2002, hearing.[2] (R. at 36)  Plaintiff's counsel made an opening statement in which she argued that Plaintiff suffers from major depressive disorder and anxiety disorder and has been in treatment since November of 2000; that both Plaintiff's treating counselor and psychiatrist attested to the severity of Plaintiff's condition and his inability to work full time; that Plaintiff participated in an extended day treatment program at Rhode Island Hospital in April of 2002; that he did so because of the severity of his emotional condition; and that Plaintiff had been disabled since his alleged onset date and remained disabled. (R. at 39)  At the conclusion of the hearing, counsel stated that she agreed with the ME that Plaintiff's "migraines and various complaints are contained within his character disorder, which ... is quite severe ...."  (R. at 81)

Plaintiff then testified.  (R. at 40-57, 59-64, 67-75, 80-81)  He stated that he lives in Providence and has had custody of his two children, ages 18 and 15, for the last four years.  (R.

---

[2] The hearing was originally scheduled for May 8, 2002.  (R. at 29)  Minutes prior to the hearing, Plaintiff's counsel submitted last-minute evidence from Rhode Island Hospital for review by the ALJ and Dr. John Ruggiano, M.D., the Medical Expert ("ME").  (R. at 31-32)  The ALJ postponed the hearing so that she and the ME would have sufficient time to review the documents.  (R. at 33-34)

at 40)   Plaintiff also related that he obtained his general equivalency degree after completing a ninth grade education. (Id.)  He verified that he had not worked since being injured at his workplace in 1987.  (R. at 40-41)  Plaintiff recounted that prior to being injured he had held eight jobs, none of which lasted for more than a year.  (R. at 41-42)  He explained that he had left "a couple of jobs," (R. at 42), because they required "dirty work," (R. at 63).   According to Plaintiff, some employers tried to make him do work which was beyond his capability.  (Id.)  As an example, Plaintiff cited being required to carry shingles up ladders, resulting in his "almost get[ting] killed."  (Id.)  In addition to leaving two jobs voluntarily, Plaintiff testified that he was laid off from other positions. (R. at 42)  He noted that he has also intermittently picked up scrap metal from trash which he sells to a junkyard for a small amount of money.  (R. at 49)

When asked by the ALJ which position he held the longest, Plaintiff replied that he was a water meter mechanic at the City of Providence Water Department for one to two years until he was laid off.  (R. at 42, 70-71)  He explained that this work entailed driving a van, working on water meters at private residences, and replacing meters.  (R. at 71)  When Plaintiff was asked why he could not perform that job today, (R. at 71), he replied that he was incredibly fatigued all the time, that he felt like a prisoner in his own body, and that his mind was "all over the place," (R. at 72).  Elsewhere in his testimony, Plaintiff stated that he did not have any energy and he did not "even want to get up to answer the phone and go to the bathroom." (R. at 52)

Plaintiff also testified that he did not return to work after his injury because he was always sick, did not want to go out of the house, and felt horrible all of the time.  (R. at 43)

He indicated that for four years he lived in the cellar of his mother's house. (<u>Id.</u>) The cellar had a dirt floor and was illuminated only by a light bulb on a cord. (<u>Id.</u>) Plaintiff did not have a refrigerator or a bed, but only a recliner which he had found on the sidewalk. (R. at 43) The only plumbing in the cellar was a sink with a broken drain. (<u>Id.</u>) There was no toilet. (<u>Id.</u>) Plaintiff described the cellar as being "cool and dark," (R. at 44), and stated that he "felt comfortable and at peace," (<u>id.</u>) He explained that "[n]o one was bothering me." (R. at 45)

Plaintiff moved into an apartment only when he received custody of his children, (R. at 44), and he has had more contact with people since that time but still does not want to be around people, (R. at 45). Plaintiff added that he suffers from panic and anxiety attacks, (R. at 46-47), that usually he cannot sleep for more than one hour at a time, (R. at 49), and that sometimes he gets so exhausted that he will blink his eyes and think that a minute has gone by when actually six or seven hours have passed, (R. at 49). He also stated that he was irritable, (R. at 68), that he was afraid of everything, (R. at 69), and that interacting with people frustrated him and made him want to withdraw, (<u>id.</u>). He indicated that he rarely leaves his apartment or goes out socially, although he has one friend who drives him to the Methadone program every two weeks and with whom he fishes once a month, (R. at 53-54).

In addition, Plaintiff testified that he procrastinated a great deal and that the only things he gets done are things that he is required to do. (R. at 72) As examples of his procrastination, Plaintiff related that he had not replaced a broken doorknob for five months even though it would only take ten minutes to fix, (R. at 73), and that he did not clean the house or do the laundry until he was "forced to," (R. at 74).

6

When forced to do something, Plaintiff tried to complete the task as fast as he could.  (R. at 72)  He stated that he was not good at doing anything "for any period of time."  (R. at 72)  Plaintiff also testified that he had difficulty concentrating when he was employed, (R. at 62), that he had a hard time paying attention to what he was doing, (id.), that he would get bored and "goof off," (R. at 62), and that he would think about other things, (id.).

The ALJ noted that the record showed Plaintiff has had numerous relapses at the Methadone program which Plaintiff had attended for the last 14 years.  (R. at 54)  Plaintiff responded that he had not had a urine with any kind of illegal drug in it for at least eight years and that even on that occasion the positive test result had been caused by his pain medication.  (R. at 54-55)  In answering a follow-up question posed by his attorney, Plaintiff insisted that his numerous relapses to heroin had occurred "only during the first few years," (R. at 56), of his participation in the Methodone program, (id.).  Plaintiff noted that he had been receiving take-home doses of Methadone for "a long, long time," (R. at 57), and indicated that this privilege is not granted unless a participant has had clean urines for "at least a year," (id.).

The ALJ observed that in July of 2001, Plaintiff had advised David Swain, a licensed clinical social worker, that he was no longer having anxiety attacks.[3]  (R. at 55, 284)  Plaintiff replied that, although he still suffered from them, he had told Mr. Swain he was no longer having severe ones, (R. at 55).  Plaintiff also testified that Dr. Polister, his psychiatrist, and

---

[3] Although the ALJ indicated that Plaintiff had made this statement to David Swain, (R. at 55), the record indicates that the statement was actually made to Dr. Peter Polister, (R. at 278).  As discussed hereafter, it appears that the ALJ mistook Dr. Polister's treatment notes for those of Mr. Swain.

7

Mr. Swain referred Plaintiff to the day treatment program at
Rhode Island Hospital.  (R. at 50-51)  He testified that it had
not helped him feel any better despite participating in it daily
for two and a half weeks.  (R. at 51)   The medical expert
("ME"), John Ruggiano, M.D., a psychiatrist, testified that the
record reflected a "whole gamut of diagnoses," (R. at 58),
including major depression, bipolar disorder, panic disorder,
substance abuse, borderline character disorder, obsessive
compulsive disorder, and social phobia, (id.).  The only
explanation he could offer for such a varied combination of ills
was to suggest "a character problem," (id.), under Listing
12.08,[4] (R. at 59).  He noted the twenty year duration of the
problem, (R. at 58), and stated that it was not likely to change,
(R. at 61).

The ME testified that three of the "A" criteria for Listing
12.08 were met, namely persistent disturbances of mood,

---

[4] According to Listing 12.08 (Personality Disorders):

The required level of severity for these disorders is met
when the requirements in both A and B are satisfied.
    A. Deeply ingrained, maladaptive patterns of behavior
associated with one of the following:
    1. Seclusiveness or autistic thinking; or
    2. Pathologically inappropriate suspiciousness or
hostility; or
    3. Oddities of thought, perception, speech and behavior;
or
    4. Persistent disturbances of mood or affect; or
    5. Pathological dependence, passivity, or aggressivity; or
    6. Intense and unstable interpersonal relationships and
impulsive and damaging behavior; AND
    B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties of social functioning; or
    3. Marked difficulties in maintaining concentration,
persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended
duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (2005).

pathological dependence and passivity, and intense and unstable interpersonal relationships and impulsive and damaging behavior. (R. at 59-60)  Asked by the ALJ what showed dependence, the ME pointed to the fact that Plaintiff lived in his mother's house for four years and that his anxiety worsened when his girlfriend left him.  (R. at 60)  The last of the "A" criteria, in the ME's view, was demonstrated by Plaintiff's history of drug abuse. (Id.)

As for the "B" criteria, the ME testified that although Plaintiff's activities of daily living were not limited, his relationships were markedly limited.  (Id.)  The ME stated that it was difficult to assess persistence without a work history. (R. at 60, 65-66)  He noted that Plaintiff concentrated during the hearing and that his concentration was good for an hour, but that in order to assess persistence in a work place for forty hours per week the ME would need to know more about why Plaintiff left his jobs.  (R. at 63)  The ME opined that if Plaintiff's job history as recounted at the hearing (eight jobs in two to three years) were true, persistence would be markedly impaired, (R. at 60-61), but that if Plaintiff left because he was laid off or the company went out of business, there would be less of an impairment, (R. at 63).  As for episodes of decompensation, the ME testified that he could not speak to them because he has not seen the onset of new illness or the worsening of a prevailing illness.  (R. at 60)  In response to an inquiry from Plaintiff's counsel as to how Plaintiff would perform if he attempted to persist in a work setting, the ME replied that "I'd look back at the record and take a closer look at why he lost those jobs and expect that ... [the] pattern would continue."  (R. at 62)

The ME testified that the record did not show a medical reason for Plaintiff's fatigue, although he acknowledged that fatigue could be a symptom of depression or mood disturbance.

9

(R. at 71)  Asked whether the record reflected symptoms of
depression, the ME responded that "[t]here are symptoms of
depression and there are symptoms of everything else in the
[diagnostic manual]."  (R. at 75)  He noted that the symptoms of
depression or mood disturbance fit within the character disorder.
(R. at 74-75)  He also stated that some of Plaintiff's
complaints, such as fatigue, migraines, and pain, come and go and
are consistent with a character disorder.  (R. at 75-76)
According to the ME, there was no conscious effort on Plaintiff's
part to deceive, but Plaintiff was uncomfortable emotionally and,
in complaining of migraines and fatigue, Plaintiff was reaching
for an explanation for his discomfort.  (R. at 77)  Thus, in the
ME's view, Plaintiff's emotional discomfort explained his
physical discomfort.  (R. at 77)

       Kenneth R. Smith, the vocational expert ("VE"), also
testified at the hearing.  (R. at 67-68, 78-79)  Asked by the ALJ
to assume a hypothetical claimant of Plaintiff's age and
educational background, who was able to perform at the light
exertional level and who was limited to low stress, simple,
repetitive tasks with no close interaction with co-workers or the
public, the VE indicated that there were jobs in the national
economy such an individual could perform.  (R. at 68)  These
included 6,000 assembler, 3,000 inspector, 2,000 hand packager,
and 1,200 light janitorial cleaning positions in Rhode Island and
southeastern Massachusetts.  (Id.)  When the ALJ added to the
hypothetical another limitation, "mild problems with
concentration," (R. at 78), the VE stated that his answer would
not change, (id.).  Plaintiff's counsel then asked if Plaintiff
would be able to perform the jobs outlined or any other type of

work if the RFC assessment from David Swain[5] accurately reflected Plaintiff's limitations.  (R. at 79)  The VE replied that Plaintiff would not be able to do those jobs or, in his opinion, any other type of work.  (Id.)

## Standard of Review

The court's function in reviewing the Commissioner's decision is a narrow one.  See Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981).  The court does not reconsider facts or re-weigh the evidence.  See Schoenfeld v. Apfel, 237 F.3d 788, 792 (7th Cir. 2001); see also Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) ("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts."); Lopez v. Chater, 8 F.Supp.2d 152, 154 (D.P.R. 1998)("In reviewing the record, the district court must avoid reinterpreting the evidence or otherwise substituting its own judgment for that of the Secretary.").  The decision "will be overturned only if it is not supported by substantial evidence,[6] or if it is based on legal

---

[5] In a Supplemental Questionnaire as to Residual Functional Capacity dated April 19, 2002, Mr. Swain indicated that Plaintiff's daily activities were severely restricted and that Plaintiff's ability to respond appropriately to supervision, respond to customary work pressures, and perform complex tasks was severely limited.  (R. at 285-86)  Mr. Swain rated as moderately severe the degree of impairment of Plaintiff's ability to relate to other people, deterioration in Plaintiff's personal habits, and constriction of Plaintiff's interests.  (R. at 285)  He also noted that Plaintiff's ability to understand, carry out, and remember instructions, respond appropriately to co-workers, and perform simple, repetitive, or varied tasks was moderately severely impaired.  (R. at 285-86)

[6] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); see also Lopez v.

error."  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).
If supported by substantial evidence in the record, the
Commissioner's decision must be upheld even if the record could
arguably support a different conclusion.  See 42 U.S.C. §
405(g)(2005); see also Lizotte v. Sec'y of Health & Human Servs.,
654 F.2d 127, 131 (1st Cir. 1981)("Although we as the trier of
fact might have reached an opposite conclusion, we cannot say
that a reasonable mind could not have decided as did the
[Commissioner] ....").

### Errors Claimed

Plaintiff alleges that: (1) the ALJ erred in failing to
accord any weight to the opinions of Dr. Polister, Plaintiff's
treating psychiatrist, and Mr. Swain, his therapist; (2) the
ALJ's mental RFC is not based on substantial evidence; and (3)
the Commissioner failed to sustain her burden of establishing
that there is other work in the national economy that Plaintiff
could perform.  Plaintiff's Brief at 1.

### Discussion

### I.   The ALJ's Decision

An individual is eligible to receive SSI if he is aged,
blind, or disabled and meets certain income requirements.  See 42
U.S.C. § 1382(a) (2005).  The Act defines disability as the
"inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months ...."  42 U.S.C. § 423(d)(1)(A) (2005); see
also 42 U.S.C. § 1382c(a)(3)(A) (2005).  A claimant's impairment
must be of such severity that he is unable to perform his
previous work or any other kind of substantial gainful employment

Chater, 8 F.Supp.2d 152, 154 (D.P.R. 1998); Suranie v. Sullivan, 787
F.Supp. 287, 289 (D.R.I. 1992).

which exists in the national economy.  See 42 U.S.C. §§
423(d)(2)(A), 1382c(a)(3)(B).  A severe impairment is defined as
one which significantly limits an individual's ability to do
basic work activities.  See 20 C.F.R. § 416.920 (2005); see also
Bowen v. Yuckert, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96
L.Ed.2d 119 (1987).  The Commissioner is directed to "consider
the combined effect of all of the individual's impairments
without regard to whether any such impairment, if considered
separately, would be of such severity."  42 U.S.C. §
423(d)(2)(B).  A claimant's complaints alone cannot provide a
basis for entitlement when they are not supported by medical
evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d
19, 20-21 (1st Cir. 1986).

Following the familiar sequential evaluation,[7] the ALJ found

---

[7] The Social Security regulations prescribe a five-step inquiry
for use in determining whether a claimant is disabled.  See 20 C.F.R.
§ 416.920(a) (2005); see also Bowen v. Yuckert, 482 U.S. 137, 140-42,
107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); Seavey v. Barnhart, 276
F.3d 1, 5 (1st Cir. 2001).  Pursuant to that scheme, the Secretary must
determine sequentially: (1) whether the claimant is presently engaged
in substantial gainful work activity; (2) whether he has a severe
impairment; (3) whether his impairment meets or equals one of the
Secretary's listed impairments; (4) whether the claimant is able to
perform his past relevant work; and (5) whether the claimant remains
capable of performing any work within the economy.  See 20 C.F.R.
§ 416.920(b)-(f).  The evaluation may be terminated at any step.  See
Seavey, 276 F.3d at 4.  "The applicant has the burden of production
and proof at the first four steps of the process.  If the applicant
has met his or her burden at the first four steps, the Commissioner
then has the burden at Step 5 of coming forward with evidence of
specific jobs in the national economy that the applicant can still
perform."  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001); see
also Seavey, 276 F.3d at 5.
   In 1996, Congress amended the Act "to preclude a finding of
disability 'if alcoholism or drug addiction would (but for this
subparagraph) be a contributing factor material to the Commissioner's
determination that the individual is disabled.'"  Brown v. Apfel, 71
F.Supp.2d 28, 35 (D.R.I. 1999)(quoting Contract for America
Advancement Act, Pub. L. No. 104-121 § 105(a)(1), 105(b)(1), 110 Stat.
847, 852-853 (codified as amended at 42 U.S.C. § 423(d)(2)(C)
(1996))), aff'd, 230 F.3d 1347 (1st Cir. 2000).

that Plaintiff had not engaged in substantial gainful activity
since his alleged onset date.  (R. at 16)  She determined that
Plaintiff's impairments, namely migraine headaches, personality
disorder, depression, and anxiety, were severe but that they did
not meet or equal a listed impairment.  (R. at 20)  The ALJ found
that Plaintiff had no past relevant work.  (R. at 21)  She
further found that Plaintiff retained the RFC to perform a
significant range of light work.  (R. at 23)  Specifically, the
ALJ determined that Plaintiff could lift and carry up to twenty
pounds occasionally and ten pounds frequently; could sit for six
hours and stand and/or walk for six hours in an eight hour work
day; was limited to low-stress work activities and simple
repetitive tasks; was unable to perform work that involves close
interaction with coworkers or the public; and had mild
limitations in concentration.  (R. at 21)  The ALJ concluded that
there was a significant number of jobs in the national economy
which Plaintiff could perform and that he was, therefore, not
disabled as defined in the Act.  (R. at 22-23)

II.  **Analysis**

   A.   **The ALJ's treatment of the opinions of Plaintiff's
        treating psychiatrist and therapist**

   Plaintiff argues that the ALJ erred in failing to accord any
weight to the opinions of Plaintiff's treating psychiatrist, Dr.

---

Thus, under the Act as amended, if a finding of disability is
made after the five step analysis, the Commissioner must go
one step further and make this materiality determination.  The
"key factor" to be considered, in fact the only factor
mentioned in the regulations, is whether the claimant would
still be disabled absent the drug addiction or alcoholism.

Brown, 71 F.Supp.2d at 35; 20 C.F.R. § 416.935(b)(1)(2005).  "A
claimant bears the burden of proving that drug or alcohol addiction is
not a contributing factor material to her disability."  Lonsberry v.
Barnhart, No. 01-245-P-H, 2002 WL 449695, at *3 (D. Me. Mar. 25,
2002)(citing Mittlestedt v. Apfel, 204 F.3d 492, 498 (8th Cir. 2000);
Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999)).

Polister, and therapist, Mr. Swain.  Plaintiff's Brief at 9.
Plaintiff further contends that the ALJ's findings with regard to
Dr. Polister and Mr. Swain are not based on substantial evidence.
Id.

### 1.  **Peter Polister, M.D.**

The ALJ determined that the opinions of the treating
psychiatrist, Dr. Peter Polister, were entitled to little weight
because they were not supported by any findings and he did not
provide an adequate explanation for his opinions.  (R. at 19)
The ALJ referenced two exhibits from Dr. Polister, a Medical
Questionnaire dated April 18, 2001, and a letter dated May 8,
2002.  (R. at 19)(apparently citing (R. at 235-63, 382)).  If
that were the only evidence in the record from Dr. Polister, the
court could accept the ALJ's rejection of the psychiatrist's
opinions as unsupported by any findings and lacking adequate
explanation (R. at 19); see also 20 C.F.R. 416.927(d).[8]

---

[8] According to § 416.927(d)(2), "[i]f we find that a treating
source's opinion on the issue(s) of the nature and severity of your
impairment(s) is well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in your case record, we will give it
controlling weight."  20 C.F.R. § 416.927(d)(2) (2005); see also
Social Security Ruling ("SSR") 96-2p, available at 1996 WL 374188, at
*2 ("The adjudicator must find that the treating source's medical
opinion is 'well-supported' by 'medically acceptable' clinical and
laboratory diagnostic techniques.  The adjudicator cannot decide a
case in reliance on a medical opinion without some reasonable support
for the opinion.").  If a treating source's opinion is not given
controlling weight, the following factors are to be considered in
determining its weight: length of the treatment relationship,
frequency of examination, and the nature and extent of the treatment
relationship; the supportability of the opinion; the consistency of
the opinion with the record as a whole; the specialization of the
source; and other relevant factors brought to the adjudicator's
attention.  20 C.F.R. § 416.927(2)-(6).  Opinions on issues reserved
to the Commissioner, such as whether a claimant is disabled, are not
considered medical opinions and receive no special significance
because they are administrative findings that are dispositive of a
case.  20 C.F.R. § 416.927(e)(1); SSR 96-5p, available at 1996 WL
374183, at *2 (same).

It appears, however, that the ALJ may have mistaken Dr. Polister's treatment notes for those of Plaintiff's therapist, David Swain. The following evidence suggests that this may have been the case. First, at the hearing, the ALJ appeared to attribute a July 25, 2000, treatment note from Dr. Polister, reflecting a decrease in Plaintiff's anxiety attacks, to Mr. Swain.[9] (R. at 55) Second, Dr. Polister's treatment notes are misidentified in the Listing of Exhibits in the record. (R. at 3) They are incorrectly identified as being the medical records of Mr. Swain. (Id.) Third, in her decision the ALJ refers by exhibit number to two of Dr. Polister's reports, (R. at 19) (citing Ex. 10F (R. at 235-36) and Ex. 16F, (R. at 382-84)), but makes no reference to Dr. Polister's treatment notes, (id.). This suggests that the ALJ did not recognize that the treatment notes were from Dr. Polister. Fourth, in discussing Mr. Swain's opinions, the ALJ cites to exhibit 13F, (R. at 18), which, while containing the April 19, 2002, Supplemental Questionnaire as to Residual Functional Capacity from Mr. Swain, (R. at 285-86), also contains Dr. Polister's treatment notes, (R. at 274-84). There is no indication that the ALJ realized that Exhibit 13F was an amalgamation of Dr. Polister's treatment notes and the Supplemental Questionnaire from Mr. Swain. (R. at 18)

The ALJ also stated that she was affording little weight to Dr. Polister's opinion because he did not provide an adequate

---

[9] At the July 23, 2002, hearing, the ALJ asked Plaintiff the following question:

"Q   Now, in July a year ago, July of 2001, you indicated to David Swain that you were no longer having the anxiety attacks?"

(R. at 55) The court concludes that the ALJ was referring to the July 25, 2001, treatment note of Dr. Polister because that note indicates that Plaintiff's anxiety has decreased, (R. at 278), and there is no treatment note from Mr. Swain for July of 2001 in the record.

explanation for his opinions.  (R. at 19)  The court agrees that the two questionnaires, (R. at 235-36, 382-84), and letter, (R. at 382), from Dr. Polister are largely conclusory in nature and could properly be discounted for that reason.  See 20 C.F.R. 416.927(d)(2).  However, the court is uncertain whether the ALJ would reach the same conclusion if she considered Dr. Polister's reports with his treatment notes, documenting a dozen appointments by Plaintiff over a fifteen month period from November 8, 2000, to March 12, 2002, (R. at 274-83). Accordingly, the matter must be remanded and the ALJ directed to consider the treatment notes of Dr. Polister in determining what weight to give to his opinions.

### 2.  David Swain, MSW, LCSW

As an initial matter, the court notes that the ALJ did not "reject" Mr. Swain's opinions, as Plaintiff contends, Plaintiff's Brief at 12.  Rather, she considered them and determined to accord them "little weight," (R. at 18), accurately observing that Mr. Swain is "not an acceptable medical source," (id.).

Section 416.913(a) of Title 20 of the Code of Federal Regulations lists the following acceptable medical sources: licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  See 20 C.F.R. § 416.913(a) (2005).[10]  A therapist such as Mr. Swain does not qualify as an

---

[10] According to § 416.913(a):

(a) Sources who can provide evidence to establish an impairment.  We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s).  Acceptable medical sources are--

(1) Licensed physicians (medical or osteopathic doctors);

(2) Licensed or certified psychologists.  Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school

17

acceptable medical source, but falls within the category of "other sources" listed in 20 C.F.R. § 416.913(d)(1).[11]

Moreover, Mr. Swain's statement in his April 2, 2002, letter to Plaintiff's counsel that "[s]ince 1988 [Plaintiff] has been on the methadone program and has not abused substances," (R. at 284), is inconsistent with other, substantial evidence in the record. For example, Dr. Ho recorded on May 21, 1999, that

---

psychologist in a school setting, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrists, for the measurement of visual acuity and visual fields (see paragraph (f) of this section for the evidence needed for statutory blindness);

(4) Licensed podiatrists, for purposes of establishing impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle; and

(5) Qualified speech-language pathologists, for purposes of establishing speech or language impairments only. For this source, "qualified" means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence from the American-Speech-Language-Hearing Association.

20 C.F.R. § 416.913(a) (2005)(citation omitted).

[11] The regulation provides, in relevant part:

In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from **other sources** to show the severity of your impairment(s) and how it affects your ability to work .... Other sources include, but are not limited to--

(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and **therapists**) ....

20 C.F.R. § 416.913(d) (2005)(bold added).

"[Plaintiff] smokes pot about once a week."  (R. at 168)   Dr.
Evans noted on November 2, 2000, that Plaintiff "began methadone
and has remained on it although there have been many relapses to
heroin during this period."  (R. at 200)   Dr. Evans diagnosed
Plaintiff with "[s]ubstance [a]buse in remission for one year,"
(R. at 201), and observed that the "prognosis for continued
abstinence from drugs is poor," (R. at 202).  Dr. Polister's note
of November 8, 2000, indicates "opiates[,] percodan, heroin - mid
20's to 2 y[ea]r[s] ago[;] tried LSD[,] mesc, cocaine, uppers[,]
downers ...."  (R. at 274)   A Neighborhood Health Clinic
psychiatry admission dated April 5, 2002, reflects that Plaintiff
"used '[j]ust about everything' as a teenager.  Used narcotic
analgesics in his 20's.  Heroin later in life.  [Negative] IVDA
30-40 [b]ags/day heroin in the past."  (R. at 302)   According to
a Rhode Island Hospital Partial Hospitalization Program Discharge
Summary signed on May 7, 2002, "[t]he [patient] also reported a
long [history] of abuse of illegal drugs and ETOH."  (R. at 293)
The court finds it highly unlikely that such a statement would be
included if Plaintiff's abuse of illegal drugs and alcohol had
ceased in 1988, some fourteen years earlier.

The court concludes that the ALJ's decision to accord little
weight to Dr. Swain's opinions is supported by substantial
evidence.  Accordingly, on remand the ALJ is not required to
reconsider those opinions.

### B.  The ALJ's finding that Plaintiff retains the mental RFC to perform light work

The RFC assessment is based on all of the relevant evidence
of a plaintiff's remaining capacity to do work despite his
impairments, and it is used to determine whether a plaintiff can
perform his past relevant work and other type of work in the
national economy.  See 20 C.F.R. § 416.945(a) (2005); 20 C.F.R. §
416.920(e) and (f).  In determining a plaintiff's mental RFC an

ALJ assesses

> the nature and extent of [the plaintiff's] mental
> limitations and restrictions and then determines [the
> plaintiff's] residual functional capacity for work
> activity on a regular and continuing basis. A limited
> ability to carry out certain mental activities, such as
> limitations in understanding, remembering, and carrying
> out instructions, and in responding appropriately to
> supervision, coworkers, and work pressures in a work
> setting, may reduce [the plaintiff's] ability to do past
> work and other work.

20 C.F.R. § 416.945(c).

Plaintiff argues that: 1) the ALJ erred in failing to make findings that Plaintiff can understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting, Plaintiff's Brief at 18; 2) the ALJ's mental RFC assessment is flawed because her finding is unsupported by the record, including the mental RFC assessments of the state agency psychologists and the ME, see id. at 18-19; and 3) the ALJ interpreted raw medical data in functional terms where no medical opinion supported the ALJ's RFC determination. See id. at 17. The ALJ found that Plaintiff has "mild limitations in concentration."[12]  (R. at 21, 23)

While there is support in the record for a finding that

---

[12] Inconsistently, elsewhere in her decision, the ALJ found that Plaintiff "suffers moderate difficulties in maintaining concentration, persistence or pace ...." (R. at 20) However, in posing her hypothetical question to the VE, (R. at 68), she directed him to assume that the hypothetical individual "has mild problems with concentration ...," (R. at 78). The VE's testimony (that there were jobs in the national economy that a hypothetical individual with the capabilities stated by the ALJ could perform, (R. at 68, 78)) was based on that assumption.

Plaintiff has a moderate limitation in concentration,[13] no medical expert assessed Plaintiff's impairment in concentration as only being mild.[14]  Because the VE's opinion regarding the number of jobs available was based on a hypothetical claimant who was only mildly impaired in his concentration, the court does not know whether the number of jobs available would be significantly eroded if the hypothetical claimant was moderately impaired. Accordingly, the matter is remanded with the direction that the ALJ redetermine Plaintiff's RFC with regard to non-exertional limitations and determine whether there are jobs available in the national economy which Plaintiff could perform.  In assessing Plaintiff's RFC, the ALJ should make explicit findings regarding Plaintiff's ability to perform the basic work-related activities the Commissioner has deemed critical to establish an individual's ability to work (i.e., ability to understand, carry out and remember instructions, respond appropriately to supervision, co-workers, and customary work pressures).  See Lancellotta v. Sec'y of Health & Human Servs., 806 F.2d 284, 286 (1st Cir. 1986) (citing SSR 85-16).  If the ALJ finds it necessary to avail herself of the services of a qualified medical expert in order to make these findings, she should do so.

---

[13] Dr. Gnys found Plaintiff to be moderately limited in three of the eight "concentration and persistence" capabilities evaluated.  (R. at 251-52)  Dr. Fishman found Plaintiff to be moderately limited in six of the eight "concentration and persistence" capabilities evaluated.  (R. at 217-18)  In the other two, Dr. Fishman found that Plaintiff was not significantly limited.  (Id.)

[14] Limitations in the functional area of concentration, persistence, or pace are rated on a five point scale: None, mild, moderate, marked, and extreme.  See 20 C.F.R. § 416.920a(c)(4) (2005).

## C.   **The Commissioner's burden of establishing there is other work in the national economy Plaintiff can perform**

The ALJ determined that Plaintiff was capable of performing a significant range of light work and that a significant number of jobs existed in the national economy which Plaintiff could perform. (R. at 23)  Plaintiff contends that the Commissioner failed to sustain her burden of establishing that there is other work in the national economy that Plaintiff can perform because the ALJ's hypothetical to the VE, upon which the ALJ relied, "failed to consider all of [Plaintiff's] functional limitations ...."  Plaintiff's Brief at 19.  Specifically, Plaintiff argues that the ALJ failed to include the restriction noted by Youssef Georgy, M.D., a state agency psychologist, who opined that Plaintiff should avoid concentrated exposure to noise and fumes, odors, dusts, gases, poor ventilation, etc., due to his migraines, see Plaintiff's Brief at 20 (citing SSR 85-15,[15] available at 1985 WL 56857); see also (R. at 192).

As the case is being remanded, in determining Plaintiff's RFC the ALJ is directed also to consider the limitation found by Dr. Georgy, that Plaintiff should avoid concentrated exposure to noise and fumes, odors, dusts, gases, and poor ventilation, (R. at 192).  If the ALJ finds that this limitation does not exist, she should explain why she is not including that limitation in Plaintiff's RFC, see 20 C.F.R. § 416.927(f)(2)(ii)("[T]he administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist ....").

---

[15] SSR 85-15 states that: "[w]here an individual can tolerate very little noise, dust, etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions." SSR 85-15, available at 1985 WL 56857, at *8.

### Summary

For the reasons stated above, the court is unable to sustain the ALJ's finding that Dr. Polister's opinions were entitled to little weight because it appears that the ALJ failed to recognize Dr. Polister's treatment notes and mistakenly attributed them to Mr. Swain.  Additionally, the ALJ's determination that Plaintiff retained the mental RFC to perform light work is not based on substantial evidence given her unsupported finding that Plaintiff had only mild limitations in concentration.  Lastly, since the case is being remanded, in determining Plaintiff's RFC, the ALJ shall also consider the limitation found by Dr. Georgy, that Plaintiff should avoid concentrated exposure to noise, fumes, odors, dusts, gases, and poor ventilation, and if she finds there is no such limitation, she is directed to state her reasons for this rejection.

### Conclusion

For the reasons stated above, the court finds that the ALJ's decision that Plaintiff is not disabled is not supported by substantial evidence in the record and contains legal errors. Accordingly, Plaintiff's Motion to Reverse or Remand is hereby granted to the extent that the matter is remanded for further administrative proceedings consistent with this Memorandum and Order.  Defendant's Motion to Affirm is hereby denied.

So ordered.

ENTER:                                      BY ORDER:

_____            _____
DAVID L. MARTIN                      Deputy Clerk
United States Magistrate Judge
January 13, 2006